[No. 6,682.—Department One.]

## WILLIAM DRESBACH et al. v. THE CALIFORNIA PACIFIC RAILROAD COMPANY.

Common Carrier—Negligence.—In the absence of any special contract, it is negligence in a common carrier of goods to deliver the consigned goods by merely placing them on the bank of a river at the point of destination, in the absence of the consignee, and not under the care of the agents of the carrier, the latter having agents at that point for the purpose of receiving and delivering goods.

Appeal from a judgment for the plaintiff, and an order denying a new trial, in the Third District Court, City and County of San Francisco.   McKee, J.

*Wilson & Wilson*, for Appellant.

A custom that a railroad company should deliver freight on the platform of minor stations, where its business would not justify a warehouse, there to be received by the consignee on discharge from the car, was held to be a good custom, and as such the custom was allowed to be proven. (*McMasters* v. *Penn. R. R. Co.* 69 Pa. St. 374.)

When a carrier delivers freight at its destination, in the manner usual at that place, its liability as common carrier is ended. (*Van Santvoord* v. *St. John*, 6 Hill, 157; *Merriam* v. *Hartford R. Co.* 20 Conn. 254; Angell on Carriers, § 301; *Thomas* v. *Boston R. Co.* 10 Met. 472; *Farmers' Bank* v. *Trans. Co.* 18 Vt. 131; *Farmers' Bank* v. *Trans. Co.* 23 id. 186.)

*George F. & William H. Sharp*, for Respondents.

There was no delivery of the goods to the consignees. (2 Redfield on Railways, p. 597; *Rice* v. *B. & W. R. R. Co.* 98 Mass. 292.)

The appellant had an agent at Jacinto. There was a small warehouse there, in which goods were occasionally placed. These goods were simply thrown out on the bank, without notice or warning to the consignees.

Ross, J.:

This action was brought to recover damages for the alleged loss, by the defendant, of certain grain sacks, shipped by the

plaintiffs at the City of San Francisco, over defendant's road, and destined for Jacinto, in Colusa County. The complaint charges that defendant was, at the times therein mentioned, a common carrier of goods for hire, between San Francisco and Jacinto, and that the plaintiffs delivered to defendant, between the 11th of June and the 23d of July, 1874, the sacks for transportation to the point named, and paid the freight thereon, and that defendant failed in its duty as common carrier, by which failure the goods were lost, to the plaintiffs' damage.

The defendant, by its answer, denied that it ever was a common carrier between San Francisco and Jacinto, but averred that its route on that line terminated at Knight's Landing; denied that it received the goods in question for transportation to any point beyond Knight's Landing, to which point, it averred, it safely transported them, and there delivered the same to the Central Pacific Railroad Company, a competent carrier, carrying to Jacinto, the place of address.

There is no dispute about the fact that the sacks were safely carried by the defendant to Knight's Landing, and were there placed on board the boat Governor Dana, by which they were safely transported to Jacinto, at which point they were placed on the bank of the river at the landing. From this place it appears they were lost.

There was no evidence of any special contract on the part of the defendant to carry the sacks to any point beyond its own route. If, therefore, its own route terminated at Knight's Landing, its liability ceased when it carried the goods to that point and delivered them in safety on board of the boat Governor Dana. (Civ. Code, § 2201.) But did the defendant's route terminate at Knight's Landing? was one of the important issues in the case. It is contended by the counsel for appellant, that the affirmative of this proposition is indisputably shown by the evidence. We do not think that can be fairly said from the record before us. It is true that Mr. Gunn, the secretary of the defendant, testified explicitly that at the time of the transaction in question the defendant's route ended at Knight's Landing, and that the boats plying on the Sacramento River between that point and Jacinto were owned and operated by the Central Pacific Railroad, a separate and distinct corpo-

ration. And there was other testimony corroborative of his statement. But there was other testimony still going to show that the defendant operated and had control of the entire route from San Francisco to Jacinto. Thus, shortly after the goods in question were shipped, Capt. Foster, who it is shown had charge of the boats plying between Knight's Landing and Jacinto, wrote the following letter to one of the plaintiffs:

" OFFICE OF THE CALIFORNIA PACIFIC R. R. Co.,
SACRAMENTO, July 24th, 1874.

" A. BULLARD, ESQ., *Chico.*

"*Dear Sir*—Yours of the 20th instant, relating to agent at Jacinto, is received. Galland & Aronson act as agents for the company at Jacinto, to the extent of receiving and delivering goods, collecting bills, etc. Communications relating to business other than the above should be addressed to me at Sacramento, or to J. C. Stubbs, General Freight Agent, San Francisco. Yours truly,

(Signed) " ALBERT FOSTER."

Here is a letter from the agent having control of all the boats plying between Knight's Landing and Jacinto, in response to a letter from one of the plaintiffs (and in respect to this very freight), entitled " Office of the *California Pacific Railroad Company*," and in which he informs Bullard that Galland & Aronson act as agents for the company (the California Pacific Railroad Company) at Jacinto, to the extent of "*receiving and delivering goods,* collecting bills, etc." In addition to this, several witnesses testified that, for goods shipped by the boats from Jacinto and other points beyond Knight's Landing, receipts were usually given in the name of the California Pacific Railroad Company, and that the money for such freights, as well as for passage from these points, was paid to the California Pacific Railroad Company. This testimony was sufficient to sustain the finding involved in the verdict of the jury, that the route of the defendant extended to Jacinto.

It is next urged for the appellant, that, if this be true, the goods in question were delivered at Jacinto, in the manner usual at that place. Jacinto, it appears, was, at the time referred to in the record, a small landing place on the Sacramen-

to River, having less than twenty inhabitants. The consignees of the goods resided some miles from there. And there was testimony given at the trial that it was customary in delivering freight at Jacinto to place it on the bank of the river, whether the consignee was present or not. Whether a deposit of the goods in this manner would have been a good delivery, if there was nothing else in the case on that subject, need not be determined, for the reason that there is testimony in the record going to show that the defendant had agents at Jacinto for the reception of goods consigned to that place, whose duty it was to receive them. The letter from Foster, already quoted, distinctly states that " Galland & Aronson act as agents for the company at Jacinto, to the extent of *receiving and delivering goods*, collecting bills, etc." There is other testimony in the case which, though evasive, also tends to show, not only that Galland & Aronson were agents for the defendant at Jacinto for the purpose of receiving and delivering goods, but that they had a freight house there, in which freight other than their own, transported by the defendant, might have been, and sometimes was, put. We extract from the testimony of Alley, who was clerk on the Governor Dana at the time the plaintiffs' goods were shipped :

" Q. Was not Galland and Aronson the agents at Jacinto for the purpose of receiving and delivering goods at that point ? A. Were they not what ?

" Q. Were they not agents of the company at Jacinto for the purpose of receiving and delivering goods at that point ? A. I never understood that they were agents of the company more than collecting bills ; that is all.

" Q. Only collecting bills ?   A. That is as far as their agency extended, to my knowledge. I never knew they had any authority to act as agents otherwise.

" Q. Whom did you get that from, and where ?   A. Well, I do not know where I got it from ; that is the general impression that I had. I do not know as any one told me so.

" Q. Captain Foster would know more about their position towards the company than you would, wouldn't he ?   A. Yes, sir ; he would be apt to.

" Q. They did used to take a hand sometimes in receiving

goods up there, didn't they? A. Well, I cannot say that they ever did, only this way, that they would almost always have goods of their own.

" Q. I am speaking of other people's goods. A. No, sir. Well, many, many times—they had not done so many times.

" Q. I suppose so; they may have been off to Chico, but have they not done so sometimes? A. Have not they received there?

" Q. Received goods belonging to other people there at Jacinto? A. How do you mean, give a receipt for the goods?

" Q. No; they don't have to give receipts to receive goods where there is only five men in a town. A. They have received goods this way: I have said to Aronson, 'There is So-and-So's goods'; for instance, 'There is Papst's goods,' or 'Mudd & Mitchell's goods'; and he said, 'All right'; that is all the reception there was.

" Q. That is enough for me. They used to receive money up there, too, didn't they? A. Yes, sir; they have collected money for the company.

" Q. They were generally at the landing on the bank, as you call it, when these boats arrived? A. It cannot be otherwise, because their goods came right to the landing where their freight house was.

" Q. That had to be? A. They had to be there; their freight house was right on the edge of the river.

" Q. You have never put other people's freight besides theirs in that little house, have you? A. Yes, sir.

" Q. That belonged to the neighborhood round about? A. We have put it in. They have not asked us to do, nor told us to do it.

" Q. The company has done it? A. We have done so, for this reason: We would say, we do not want to leave them out on the bank, and we will put it in your warehouse, we would say.

" Q. That is very reasonable. How often have you done that little thing? A. Well, I cannot tell how often: a number of times.

" Q. Did you ever call Aronson out when these bags were being delivered, or any bags, and count them out to him? A.

Yes, sir. I looked round for him once to count a lot of bags for a consignee, but I could not find him. I wanted him to do it to satisfy the consignee that we had delivered the goods correctly. I could not find him; he was not there.

"Q. I am asking you, when you have been discharging freight at Jacinto, whether you have not called Aronson to come and overlook the count? A. I have done so; yes, sir."

If the defendant had agents at Jacinto for the reception of goods consigned to that point, and such agents neglected to receive and care for the plaintiffs' goods, and by reason of such neglect the goods were lost, the defendant is undoubtedly liable therefor.

On the question of fact involved, the finding was against the defendant. We cannot say it was not correctly so. Those facts being thus determined, judgment properly went for the plaintiffs.

Judgment and order affirmed.

McKEE, J., and McKINSTRY, J., concurred.